IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TONY KORAB, TOJIO CLANTON, and KEBEN ENOCH, each individually and on behalf of those persons similarly situated,<br><br>    Plaintiffs,<br><br> vs.<br><br>LILLIAN B. KOLLER, in her official capacity as Director of the State of Hawaii, Department of Human Services, and KENNETH FINK, in his official capacity as State of Hawaii, Department of Human Services, Med-QUEST Division Administrator,<br><br>    Defendants.<br>_____ | CIVIL NO. 10-00483 JMS/KSC<br><br>ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED AS TO COFA RESIDENTS |

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED AS TO COFA RESIDENTS

## I.  INTRODUCTION

On April 5, 2010, Plaintiffs filed this class action asserting claims

against Lillian Koller, in her official capacity as Director of the State of Hawaii,

Department of Human Services ("DHS"), and Kenneth Fink, in his official

capacity as State of Hawaii, DHS, Med-QUEST Division Administrator

(collectively "Defendants") challenging DHS's implementation of a new health

care benefits program, Basic Health Hawaii ("BHH"), which Defendants created for non-pregnant citizens, age nineteen or older, of countries with Compacts of Free Association ("COFA") with the United States who are lawfully residing in Hawaii ("COFA Residents"), and non-pregnant immigrants, age nineteen or older, who have been United States residents for less than five years ("New Residents"). Plaintiffs are COFA Residents who bring this action on behalf of themselves and others similarly situated, asserting that BHH violates (1) the Equal Protection Clause of the Fourteenth Amendment because it provides less health benefits than the State of Hawaii's (the "State") Medicaid program offered to citizens and certain qualified aliens, and (2) and the Americans with Disabilities Act (the "ADA") because BHH is not administered in the most integrated setting appropriate to meet their medical needs.

Currently before the court is Defendants' Motion to Dismiss in which they argue that the Complaint as directed to COFA Residents fails to state a claim upon which relief can be granted.[1]  Based on the following, the court DENIES Defendants' Motion to Dismiss.

---

[1]  Although the briefing also addressed Plaintiffs' claims as they relate to New Residents, the parties agreed at the November 2, 2010 hearing that the court would limit its analysis at this time to COFA Residents only.

## II.  BACKGROUND

**A.    Factual Background**

To put Plaintiffs' claims in context, the court first outlines the history of Medicaid and health care in Hawaii as relevant to this action, and then outlines the allegations of the Complaint.

### 1.    *History of Medicaid Benefits Provided to Aliens in Hawaii*

Medicaid is a cooperative federal-state program that provides federal funding for state medical services to the poor, disabled, and others in need.  42 U.S.C. § 1396 *et seq*.  "State participation is voluntary; but once a State elects to join the program, it must administer a state plan that meets federal requirements." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004) (citations omitted).

The Personal Work Opportunities Reconciliation Act of 1996 ("PRWORA") changed Medicaid law significantly.  As is relevant to this action,[2] the PRWORA limited Medicaid availability to aliens in an effort to, among other things, "remove the incentive for illegal immigration provided by the availability of public benefits" and encourage "self-sufficiency."  8 U.S.C. § 1601(1), (6).  The PRWORA divided aliens into two groups -- qualified aliens and non-qualified

---

[2]  The PRWORA provided comprehensive welfare reform, but the court is concerned with Title IV only, which addresses eligibility of aliens for certain benefits.

aliens.  Qualified aliens include lawful permanent residents, designated refugees, aliens granted asylum, and certain other specified categories of lawfully present aliens.  8 U.S.C. § 1612(b); *id.* § 1641(b).  Qualified aliens may receive Medicaid if they entered the United States prior to August 22, 1996, or otherwise have lived in the United States for at least five years.  8 U.S.C. § 1613(a).  Nonqualified aliens are not eligible for Medicaid benefits.

The PRWORA further provides that states, with their own funding, may provide benefits for certain aliens who are not otherwise eligible for federal Medicaid benefits.  The PRWORA provides that state programs may not exclude certain groups of aliens, 8 U.S.C. § 1622(b), but must exclude other certain groups. *Id.* § 1621(a).  As for a third group of aliens not qualified for federal benefits -- which include COFA Residents[3] -- the PRWORA gives discretion to the states to determine eligibility for state benefits.  Specifically, 8 U.S.C.

§ 1622(a) provides:

> Notwithstanding any other provision of law . . . , a State is authorized to determine the eligibility for any State public benefits of an alien who is a qualified alien (as defined in section 1641 of this title), a nonimmigrant under the Immigration and Nationality Act [8 U.S.C.A. § 1101 et seq.], or an alien who is paroled into the United

---

[3]  COFA Residents are "non-immigrants." *see* Pub. L. No. 99-239 § 141.  The parties agree that COFA Residents fall within this third group of aliens for which the PRWORA has granted discretion to the states to determine eligibility of benefits.

States under section 212(d)(5) of such Act [8 U.S.C.A. § 1182(d)(5)] for less than one year.

Notwithstanding these restrictions on eligibility for Medicaid and state benefits, all aliens may receive state and federally funded emergency medical treatment. *See* 8 U.S.C. §§ 1611(b)(1)(A), 1613(c)(2)(A), 1621(b)(1). *See also Soskin v. Reinertson*, 353 F.3d 1242, 1245 (10th Cir. 2004) (explaining provisions of the PRWORA); *Aliessa ex rel. Fayad v. Novello*, 754 N.E.2d 1085 (N.Y. 2001) (same).

### 2.    *Allegations in the Complaint*

After the PRWORA went into effect, the State decided to provide the same medical benefits to COFA Residents -- using state funds only -- that are provided through Medicaid to citizens and qualified aliens who meet the durational residency requirement. Compl. ¶ 20. As such, COFA Residents could participate in the State's QUEST, QExA, QUEST-Net, QUEST-ACE, fee-for-service, and SHOTT programs ("Old Programs").[4]

On July 1, 2010, DHS Med-Quest implemented BHH -- a medical

---

[4] As stipulated by the parties, the State did not adopt any administrative rules to create a state-funded medical assistance program, and instead created a de facto state-funded medical assistance program by continuing to provide medical assistance benefits to COFA Residents and paying for those benefits entirely with State funds. *See* Doc. No. 29 ¶¶ 2-3. COFA Residents used the same application as that used for applicants seeking federal Medicaid and state-funded medical assistance. *Id.* ¶ 4. So long as the COFA Resident met the income and asset eligibility requirements for Hawaii's Federal Medicaid program, the COFA Resident received the same benefits as those provided under the Old Programs. *Id.* ¶ 5.

benefits program for non-pregnant COFA Residents age nineteen or older.  *Id.* ¶ 1. As of this date, DHS disenrolled COFA Residents who were not pregnant and who were age 19 or older from the Old Programs and enrolled them in BHH.  *Id.* ¶ 29. As alleged in the Complaint, in enacting BHH, Defendants specifically targeted COFA Residents because of their alienage and immigrant status.  *Id.* ¶ 30.

Enrollment in BHH is capped at 7,000 statewide, and an open application period will not occur until enrollment drops below 6,500.  *Id.* ¶ 33. Given that over 7,500 residents were admitted into BHH, new enrollment is unlikely.  *Id.* ¶ 34.  Thus, COFA Residents who were not enrolled into BHH cannot get State health benefits.  *Id.* ¶ 35.

As compared to the Old Programs, BHH provides only limited care. While the Old Programs provide comprehensive medical, behavioral, and prescription coverage, under BHH, transportation services are excluded and patients can receive no more than ten days of medically necessary inpatient hospital care per year, twelve outpatient visits per year, and a maximum of four medication prescriptions per calendar month.  *Id.* ¶¶ 31-32.  Further, BHH covers dialysis treatments as an emergency medical service only, and the approximate ten to twelve prescription medications dialysis patients take per month are not fully covered.  *Id.* ¶ 37.  BHH also does not provide a comprehensive program for

cancer treatments, causing cancer patients to exhaust their allotted doctors' visits within two to three months. *Id.* ¶ 38. Finally, COFA Residents in need of an organ transplant were removed from SHOTT (the State's organ and tissue transplant program), and COFA Residents may not enroll in programs covering long-term care services. *Id.* ¶¶ 41-42.

COFA Residents without an insurance plan, or those individuals under BHH who have used up their allotted patient visits under BHH, must use the State's program for Medical Assistance to Aliens and Refugees ("MAAR"). *Id.* ¶ 44. MAAR requires patients to wait until they have developed a serious medical condition posing a serious threat to bodily health, and then seek treatment in a hospital setting. *Id.* ¶ 45. The Complaint asserts that by requiring these individuals to seek care in a hospital setting, Defendants are not administering their programs in the most integrated setting appropriate to meet the needs of patients with disabilities in violation of the ADA. *Id.* ¶ 46.

**B.    Procedural Background**

On August 23, 2010, Plaintiffs filed this action, alleging claims for violations of the Equal Protection Clause and the ADA.

On September 9, 2010, Defendants filed a Motion to Dismiss. On September 13, 2010, Plaintiffs filed a Motion for Preliminary Injunction. On

October 4, 2010, Defendants filed their Opposition to the Motion for Preliminary Injunction, and Plaintiffs filed their Opposition to the Motion to Dismiss on October 5, 2010.  Replies were filed on October 12, 2010.

A hearing was held on November 2, 2010.  During the hearing, the parties agreed that at this time the court would limit its analysis to Plaintiffs' claims as they relate to COFA Residents, pending further briefing regarding New Residents.  The court further deferred hearing argument on the Motion for Preliminary Injunction pending the resolution of several issues.  This Order therefore addresses only Plaintiffs' claims as they relate to COFA Residents.

## III.  <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss a claim for "failure to state a claim upon which relief can be granted[.]"

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008).  This tenet -- that the court must accept as true all of the allegations contained in the complaint -- "is inapplicable to legal conclusions."  *Iqbal*, 129 S. Ct. at 1949.  Accordingly, "[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556). Factual allegations that only permit the court to infer "the mere possibility of misconduct" do not show that the pleader is entitled to relief as required by Rule 8. *Id.* at 1950.

## IV. <u>DISCUSSION</u>

Defendants argue that Plaintiffs have failed to state a claim upon which relief can be granted under either the Equal Protection Clause or the ADA. The court addresses these claims in turn.

## A. **Equal Protection**

The Fourteenth Amendment declares that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amdt. 14, § 1. "[T]he term 'person' in this context encompasses lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." *Graham v. Richardson*, 403 U.S. 365, 371 (1971).

In determining an equal protection challenge, different levels of

scrutiny apply to different types of classifications.  Plaintiffs assert that Defendants' provision of medical benefits violates the Equal Protection Clause because it discriminates between citizens and certain groups of aliens who may receive Medicaid, and COFA Residents who may receive benefits under BHH only.  Plaintiffs contend that this classification is based on alienage and therefore subject to strict scrutiny, allowing the court to uphold this program only if it "advance[s] a compelling state interest by the least restrictive means available." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984).  In comparison, Defendants argue that they simply followed the classifications created by the PRWORA such that BHH is subject to a rational basis review, requiring the court to uphold this program "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [people's] actions were irrational."  *Gregory v. Ashcroft*, 501 U.S. 452, 471 (1991) (quotations and citations omitted).  To address these arguments, the court first outlines the relevant framework for addressing classifications based on alienage, and then applies the framework to the facts of this action to determine under what standard BHH must be reviewed.

>    ### 1.    *Framework*

In general, state classifications based on alienage are subject to strict

scrutiny.  *See, e.g.*, *Bernal*, 467 U.S. at 227-28 (invalidating Texas statute that required notary publics to be citizens under strict scrutiny standard); *Nyquist v. Mauclet*, 432 U.S. 1, 7-12 (1977) (using strict scrutiny in striking down New York statute that restricted eligibility for college scholarships based on alienage); *Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 601-02 (1976) (applying strict scrutiny to strike down Puerto Rico's ban on aliens practicing civil engineering); *In re Griffiths*, 413 U.S. 717, 718-23 (1973) (striking down Connecticut law barring resident aliens from taking the bar examination); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 418-20 (1948) (ruling California statute barring issuance of fishing licenses to persons ineligible for citizenship invalid).

For example, *Graham v. Richardson*, 403 U.S. 365 (1971), applied strict scrutiny to invalidate Arizona and Pennsylvania statutes that denied welfare benefits to otherwise qualified recipients who were aliens.  The Pennsylvania statute limited state welfare benefits to citizens or those who had filed a declaration of intent to become a citizen.  *Id.* at 368.  In comparison, the Arizona statute limited benefits under federally funded programs to citizens or individuals who had resided in the United States for at least fifteen years.  *Id.* at 367.  *Graham* explained that strict scrutiny applies to these state classifications based on alienage:

11

> Under traditional equal protection principles, a State
> retains broad discretion to classify as long as its
> classification has a reasonable basis.  This is so in "the
> area of economics and social welfare."  But the Court's
> decisions have established that classifications based on
> alienage, like those based on nationality or race, are
> inherently suspect and subject to close judicial scrutiny.
> Aliens as a class are a prime example of a "discrete and
> insular" minority for whom such heightened judicial
> solicitude is appropriate.  Accordingly, it was said in
> [*Takahashi*, 334 U.S. at 420], that "the power of a state to
> apply its laws exclusively to its alien inhabitants as a
> class is confined within narrow limits."

*Id.* at 371-72 (citations and footnotes omitted).  Applying strict scrutiny to both

statutes, *Graham* concluded that "a state statute that denies welfare benefits to

resident aliens and one that denies them to aliens who have not resided in the

United States for a specified number of years violate the Equal Protection Clause."

*Id.* at 376.

In coming to this conclusion, *Graham* rejected Arizona's argument

that its durational residency requirement was authorized by § 1402(b) of the Social

Security Act, 42 U.S.C. § 1352(b), which required that the Secretary not approve

state-submitted plans that exclude citizens of the United States from eligibility.  *Id.*

at 380-81.  *Graham* explained that although the meaning of the federal statute was

not clear, it neither authorized nor commanded states to adopt durational residency

requirements.  *Id.* at 381.  Further, to the extent the federal statute could be

construed as authorizing "discriminatory treatment of aliens at the option of the States," *Graham* rejected such construction because it would present "serious constitutional questions" and "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." *Id.* at 382. *Graham* explained that while *Congress* has the power to "establish a uniform Rule of Naturalization," "[a] congressional enactment construed so as to permit state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs would appear to contravene this explicit constitutional requirement of uniformity." *Id.*

*Graham* left open the applicable standard of review when Congress enacts a statute providing benefits based on alienage. *Mathews v. Diaz*, 426 U.S. 67 (1976), answered the question when it upheld a federal law that granted Medicare benefits to certain resident citizens yet denied eligibility to comparable aliens unless they were permanent aliens or had resided in the United States for at least five years. *Matthews* explained that this federal law was subject to rational basis review:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must

13

> be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary. . . .  The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

426 U.S. at 81-82 (footnotes and citations omitted).  Upholding the federal statute, *Mathews* found that "it is unquestionably reasonable for Congress to make an alien's eligibility depend on both the character and the duration of his residence." *Id.* at 83.

Since *Mathews*, courts have upheld federal classifications between citizens and aliens using a rational basis review.  *See Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001) (upholding PRWORA's denial of prenatal Medicaid benefits to unqualified aliens based on rational basis review); *Aleman v. Glickman*, 217 F.3d 1191, 1197 (9th Cir. 2000) (applying rational basis review to challenge of the PRWORA's eligibility requirements for food stamps); *City of Chcago. v. Shalala*, 189 F.3d 598, 603-05 (7th Cir. 1999) (applying rational basis review to challenge to PRWORA that disqualified noncitizens from supplemental social security income and food stamps); *Rodriguez v. United States*, 169 F.3d 1342, 1346-50 (11th Cir. 1999) (same).

The two different standards of review for alienage classifications are

born out of the different roles the federal and state governments hold regarding

aliens.  While the federal government has broad constitutional power to "establish

a uniform Rule of Naturalization," U.S. Const. Art. I, § 8, cl. 4, the States have no

such power.  *See Mathews*, 426 U.S. at 84-85 ("[I]t is the business of the political

branches of the Federal Government, rather than that of either the States . . . , to

regulate the conditions of entry and residence of aliens."); *Hampton v. Mow Sun

Wong*, 426 U.S. 88, 102 n.21 (1976) ("It is important to note that the authority to

control immigration is . . . only vested solely in the Federal Government, rather

than the States[.]"); *Takahashi*, 334 U.S. at 418-19 ("The Federal Government has

broad constitutional powers in determining what aliens shall be admitted to the

United States, the period they may remain, regulation of their conduct before

naturalization, and the terms and conditions of their naturalization.  Under the

Constitution the states are granted no such powers; they can neither add to nor take

from the conditions lawfully imposed by Congress upon admission, naturalization

and residence of aliens in the United States or the several states."); *see also Toll v.

Moreno*, 458 U.S. 1, 10 (1982).

Despite this seemingly clear line between state action that is subject to

strict scrutiny on the one hand, and federal action that is subject to rational basis

review on the other, *Graham* contemplated that a different standard of review

might apply to state action where the states are merely following federal direction on the treatment of aliens. *See Graham*, 403 U.S. at 382-83. Subsequent caselaw confirms that where Congress has established a uniform rule regarding alienage for the states to follow, the state's action in following Congress' mandate is subject to rational basis review. *See Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982); *Sudomir v. McMahon*, 767 F.2d 1456, 1464-66 (9th Cir. 1985). This "uniform rule" exception providing for the lower standard of review is due to the fact that a mandate from the federal government is essentially an act of Congress (albeit through the arms of the states). As *Plyler* explains:

> With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy, to the federal prerogative to control access to the United States, and to the plenary federal power to determine who has sufficiently manifested his allegiance to become a citizen of the Nation. No State may independently exercise a like power. *But if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction.*

457 U.S. at 219 n.19 (emphasis added).

### 2.   *Application -- Standard of Review*

From this caselaw, the court distills the following: First, *Graham* teaches that a state's decision to treat aliens differently from citizens is subject to

strict scrutiny.  Second, *Mathews* teaches that the federal government's decision to treat aliens differently from citizens is subject to rational basis review.  Third, *Plyler* teaches that if the federal government has prescribed a uniform rule regarding how the states must treat aliens, the state's implementation of that rule is subject to rational basis review because the state is simply following the mandate of the federal government.

BHH does not fit squarely into either of the first two rules.  On its face, the State's health benefit programs appear to classify individuals based on alienage -- citizens and qualified residents receive benefits under the Old Programs, while COFA Residents are eligible for BHH only.  With that said, however, the PRWORA in 1996 (1) made certain groups of aliens no longer eligible for federal funding, (2) granted states the authority to determine eligibility of state benefits for certain groups of aliens including COFA Residents, and (3) required the states to either grant or deny benefits to other groups of aliens based on certain criteria.  *See* 8 U.S.C. §§ 1621(a), 1622(a) & (b).  For the last fourteen years, Defendants have treated COFA Residents the same as citizens and other qualified aliens by allowing them access to the same programs, with the only difference being that COFA Residents' participation was funded through State

dollars only.[5]  It is only now that Defendants have decided to single out COFA

Residents for lesser benefits than are provided to citizens and other classes of

aliens.  Accordingly, at issue is whether the PRWORA validly granted states the

authority to classify individuals based on alienage in determining eligibility for

these programs.

　　　　As described above, for the PRWORA to validly allow states to

classify based on alienage, pursuant to *Plyler*, the PRWORA must establish a

uniform rule for the states to follow.  *Plyler*, however, did not establish the

contours of when the uniformity requirement is met, and courts have fallen on both

sides of the issue in determining whether the PRWORA establishes a uniform rule

allowing the states to choose whether to grant benefits to certain groups based on

alienage.  *Compare Soskin v. Reinertson*, 353 F.3d 1242, 1256 (10th Cir. 2004)

(finding that Colorado law removing optional Medicaid coverage to legal aliens

was subject to rational basis review due to PRWORA); *and Doe v. Comm'r of

Transitional Assistance*, 773 N.E.2d 404, 410 (2002) (finding Massachusetts law

with six-month residency requirement subject to rational basis review in light of

---

[5]  Both parties have presented arguments regarding the significance of the fact that the State receives federal funds to assist in providing public assistance to COFA Residents.  No party, however, has asserted that the purpose of these funds is to pay for COFA Residents' participation in the Old Programs to the same extent as the federal government pays for qualified individuals in Medicaid.  Accordingly, that the State receives money designated for COFA Residents does not affect the court's analysis one way or another.

PRWORA); *with Hong Pham v. Starkowski*, 2009 WL 5698062, at \*16 (Conn. Super. Dec. 18, 2009) (applying strict scrutiny to state action terminating medical benefits to legal noncitizens despite PRWORA); *Ehrlich v. Perez*, 908 A.2d 1220, 1241 (Md. App. 2006) (concluding that the PRWORA prescribes no uniform rule and applying strict scrutiny); *Aliessa*, 754 N.E.2d at 1098 (concluding that the PRWORA prescribes no uniform rule such that state law denying medical assistance to legal immigrants was subject to strict scrutiny).

For example, in *Soskin* -- a case whose facts are very similar to those presented in this action -- Colorado originally provided optional Medicaid coverage to legal aliens no longer covered by the PRWORA, but removed this coverage in 2003 to assist in easing its budget shortfall.  353 F.3d at 1246.  *Soskin* found that Colorado's decision to limit benefits to legal aliens was subject to rational basis review based on *Mathews*.  *Id.* at 1255.  Although *Soskin* recognized that the PRWORA was different than the statute at issue in *Mathews* because the PRWORA gave the states "a measure of discretion" in determining whether to provide benefits funded only through state funds, *Soskin* reasoned that rational basis nonetheless applies because the states' exercise of discretion to limit benefits effectuates the PRWORA's concern that "individual aliens not burden the public benefits system."  *Id.* at 1255 (quoting 8 U.S.C. § 1601(4)).

19

According to *Soskin*, the PRWORA essentially created two welfare programs -- one for citizens, and one for aliens, with the states having the option of including more or less aliens in the latter. *Id.* at 1255-56. *Soskin* found that the states' discretion in implementing the latter program did not run afoul of the uniformity requirement because (1) Congress' authority to enact the PRWORA may come from a source other than Naturalization Clause requiring a "uniform Rule of Naturalization," Const. Art. 1, § 8, cl. 4; and (2) the PRWORA did not undermine the purpose of the uniformity rule, which was to treat as full citizens anyone admitted to citizenship by another state. *Id.* at 1256-57; *see also Doe*, 733 N.E.2d at 410 (finding statute that created a state-funded supplemental program to provide assistance to qualified aliens no longer eligible for federally-funded benefits did "not enact or incorporate into State Law a uniform Federal policy or guideline regarding the availability of welfare benefits to aliens").

In comparison, *Aliessa* applied strict scrutiny to a New York statute that terminated state-funded Medicaid benefits for certain non-qualified aliens, but maintained benefits for other aliens. 754 N.E.2d at 1092. *Aliessa* found that the PRWORA could not "constitutionally authorize New York to determine for itself the extent to which it will discriminate against legal aliens for State Medicaid eligibility." *Id.* at 433. *Aliessa* explained that the PRWORA's grant of discretion

20

to the states violated the uniformity requirement because it allowed for variation

among the states:

>Thus, in administering their own programs, the States are free to discriminate in either direction -- producing not uniformity, but potentially wide variation based on localized or idiosyncratic concepts of largesse, economics and politics.  Considering that Congress has conferred upon the States such broad discretionary power to grant or deny aliens State Medicaid, we are unable to conclude that title IV reflects a uniform national policy. If the rule were uniform, each State would carry out the same policy under the mandate of Congress -- the only body with authority to set immigration policy.

*Id.* at 435.  *Hong Pham*, 2009 WL 5698062, at *16 (finding that PRWORA did not

meet uniformity requirement because it "simply does not provide the states with

any sort of consistent guidance or clear limits as to what they can and cannot do in

dealing with legal aliens who lost their eligibility for federal Medicaid"); *Ehrlich*,

908 A.2d at 1241 ("The unbridled discretion afforded by Congress prevents us

from characterizing the material provisions of PRWORA as 'uniform.'").

What the courts *have* agreed on is that the PRWORA grants the states

discretion in determining whether to grant benefits to certain classes of aliens.  The

issue therefore becomes whether this grant of discretion comports with the

uniformity requirement.  The court finds *Sudomir v. McMahon*, 767 F.2d 1456 (9th

Cir. 1985), instructive in answering this question in the negative.

While *Plyler* left undefined what "uniformity" means, *Sudomir* explains that the uniformity requirement is met where the federal statute outlines both what the states may and may not do.  In *Sudomir*, the plaintiffs raised an Equal Protection challenge to California's decision not to provide welfare benefits under a cooperative federal-state assistance program, the Aid to Families with Dependent Children ("AFDC") program, to plaintiff/aliens who had applied for, but not yet received, political asylum.  Even though the program distinguished between individuals based on alienage, California was simply following a federal statute, which provided that to be eligible for the AFDC program, the "individual *must be* . . . [inter alia] an alien . . . permanently residing in the United States under color of law . . . ."  767 F.2d at 1466 (quoting 42 U.S.C. § 602(a)(33) (1984)).

*Sudomir* interpreted the federal statute as *requiring* participating states "not only to grant benefits to eligible aliens but also to *deny* benefits to aliens" that do not meet the federal standard.  *Id.* at 1466.  Thus, by limiting AFDC benefits as outlined by the federal statute, *Sudomir* found that California had "employed both a federal classification *and* a uniform federal policy regarding the appropriate treatment of a particular subclass of aliens," which was subject to rational basis review.  *Id.*  *Sudomir* reasoned that "[i]t would make no sense to say that Congress has plenary power in the area of immigration and naturalization and then hold that

22

the Constitution impels the states to refrain from adhering to the federal guidelines." *Id.*; *Cf. Graham*, 403 U.S. at 382-83 ("[A] congressional enactment construed so as to permit state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs would appear to contravene this explicit constitutional requirement of uniformity.").

*Sudomir* helps to clarify that the uniformity requirement, as its name suggests, is met where the federal government outlines how the states *must* act regarding classification of aliens.  In contrast to the statute in *Sudomir*, the PRWORA does not dictate any particular state action as to COFA Residents, and instead gives states a choice as to whether they should be eligible for any state public benefits.  This broad grant of discretion creates neither a federal classification nor a uniform federal policy because the states can do as they please regarding these individuals -- under the PRWORA, states may provide these individuals no benefits, some benefits, or the same benefits provided to citizens and qualified aliens.  By failing to provide any guidance to states regarding how to choose among these options, the PRWORA does not establish uniformity, but rather fosters a lack of uniformity between the states based on the state's own considerations of who should receive benefits based on alienage.  *See Aliessa*, 754 N.E.2d at 1098 (finding that the PRWORA violates the uniformity requirement

because it allows "potentially wide variation based on localized or idiosyncratic concepts of largesse, economics and politics").  In other words, the PRWORA's grant of discretion does not guarantee that each state will adopt the same laws regarding non-qualified aliens.

The court therefore agrees with those courts finding that the PRWORA does not establish a uniform rule that would subject BHH to rational basis review because the PRWORA does not *require* that Defendants provide lesser benefits to COFA Residents than it does to those qualified under the Old Programs.  Accordingly, the court holds that Defendants' determination that COFA Residents should no longer receive the same benefits as citizens and other aliens is subject to strict scrutiny.

In opposition, Defendants argue that the court should follow the reasoning in *Soskin*.  Defs.' Mot. 19-21.  To a point, *Soskin* is instructive to the court's analysis.  *Soskin* recognized that Colorado's decision to no longer provide optional Medicaid coverage to legal aliens fell "somewhere in between" *Graham* and *Mathews*, and that the relevant question boiled down to whether Congress had clearly "expressed its will regarding a matter relating to aliens."  *Soskin*, 353 F.3d at 1255.  Where the court disagrees with *Soskin*, however, is in its next step of the analysis.

24

*Soskin* reasoned that the PRWORA reflects a Congressional policy that some aliens must be provided benefits, other aliens must not be provided benefits, and that states may choose for themselves whether to provide benefits to the remaining aliens. *Id.* at 1255. As to this latter group of aliens, *Soskin* explained that Congress effectively gave "each state the ability to make its own assessment of whether it can bear the burden of providing any optional coverage," and a state effectuates this national policy by exercising its discretion. *Id.* Applying *Mathews*, *Soskin* found that because Congress has expressed a national policy that it has the power to enact, the courts must be deferential in reviewing the states' implementation of that policy. *Id. Soskin*, however, then goes far off track by ignoring the Naturalization Clause's uniformity requirement.

In the abstract and without the confines of the uniformity requirement, *Soskin's* analysis makes sense -- Congress has created a national policy through the PRWORA and states are simply following that policy in determining whether to provide benefits to certain groups of aliens. Unlike *Soskin*, however, the court cannot give such short shrift to the uniformity requirement.

Specifically, *Soskin* relied on an unduly restrictive interpretation of the uniformity requirement, finding that it *might* not apply because Congress' authority to enact the PRWORA *may* come from a source other than the

Naturalization Clause and the purpose of the uniformity requirement is limited to

treating anyone admitted to citizenship by another state as a citizen in another

state.[6]  *Id.* at 1256-57.  Contrary to *Soskin's* rejection of the uniformity requirement

under these circumstances, *Graham* explains that while Congress has the power to

"establish a uniform Rule of Naturalization," "[a] congressional enactment

construed so as to permit state legislatures to adopt divergent laws on the subject of

citizenship requirements for federally supported welfare programs would appear to

contravene this explicit constitutional requirement of uniformity."  *Graham*, 403

U.S. at 382.

Further, although *Soskin* rejected this language in *Graham* as dicta,

*Sudomir* recognized *Graham's* suggestion that "congressional enactments

permitting states to adopt divergent laws regarding the eligibility of aliens for

federally supported welfare programs" are invalid.  *Sudomir*, 767 F.2d at 1466-67.

---

[6]  Although *Soskin* suggests that the PRWORA's alien provision may not rest on the Naturalization Clause, it provides no alternative basis for Congress' authority to legislate in this area.  Further, *Soskin's* limitation of the Naturalization Clause's uniformity requirement to its original purpose has not been adopted by other courts, and certainly not the Ninth Circuit.  *See Sudomir v. McMahon*, 767 F.2d 1456, 1466-67 (9th Cir. 1985).  In fact, in Federalist 32, Alexander Hamilton noted that immigration was one of the few powers delegated exclusively to the federal government.  The constitutional power "to establish a UNIFORM RULE of naturalization . . . must necessarily be exclusive; because if each State had power to prescribe a DISTINCT RULE, there could not be a UNIFORM RULE."  The Federalist No. 32 (internal quotation marks omitted, emphasis in original); *see also Ex Parte Clark*, 100 U.S. 399, 412 (1879) ("[T]he Constitution invests Congress with the 'power to establish a uniform rule of naturalization;' and this power, from its nature, is exclusive.  A concurrent power in the States would prevent the uniformity of regulations required on the subject.").

*Sudomir* found that the uniformity requirement was met where California merely followed the federal government's mandate regarding eligibility of certain classes of aliens for welfare benefits under the AFDC program. *Id.* at 1466. Thus, applying *Graham* and *Sudomir*, the court rejects *Soskin's* refusal to recognize the uniformity requirement, and finds that Congress' authority to distinguish between citizens and aliens stems from the Naturalization Clause and the uniformity rule must be met where the states rely on a federal statute as providing a basis to distinguish between citizens and aliens.

Defendants also argue that they are not classifying individuals based on alienage because Defendants are simply creating a benefits program for individuals not covered by Medicaid, and the Equal Protection clause does not require the states to create a program for individuals not covered by Medicaid, much less to provide those individuals the same level of benefits as Medicaid. The court rejects this argument.

As an initial matter, regardless of how Defendants attempt to characterize their actions, Defendants' implementation of the Old Programs and BHH classify individuals based on alienage -- citizens and certain groups of aliens are eligible to participate in the Old Programs, while COFA Residents are eligible to participate in BHH. Because Defendants were not following any uniform rule

27

established by federal law in making these distinctions, these classifications are subject to strict scrutiny.

The court further rejects Defendants' attempt to characterize their actions as simply creating a brand new benefits program where one did not exist. For the last fourteen years Defendants have provided COFA Residents the same benefits as those provided to citizens and other qualified aliens, creating a unified program treating citizens, qualified aliens, and non-qualified aliens the same, regardless of federal funding.  Accordingly, the issue is not whether a state must create a benefits program for certain groups of individuals where no program exists, but rather where a program involving state funding already exists, whether a state may then exclude certain groups from that program based on alienage.

In sum, where the federal government does not require Defendants to take any particular action and the State on its own has decided to exclude certain groups of aliens from its Old Programs, Defendants' decision is state action subject to strict scrutiny.  The court therefore applies strict scrutiny to Defendants' decision to enroll COFA Residents into BHH.

### 3. *Application -- Strict Scrutiny Analysis*

Applying strict scrutiny, *i.e.*, requiring Defendants to show that their classification "advance[s] a compelling state interest by the least restrictive means

available," *Bernal*, 467 U.S. at 219, the court finds that Plaintiffs have stated a claim upon which relief can be granted.  Defendants have failed to identify *any* particular State interest that is forwarded by their decision to exclude COFA Residents from the Old Programs.  Further, while the court recognizes that BHH was created in response to the State's budget crisis, the "justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens."  *Graham*, 403 U.S. at 376 (quotation and citation signals omitted).

In opposition, Defendants argue that the court should follow the reasoning in *Avila v. Biedess*, 78 P.3d 280 (Ariz. Ct. App. 2003), which was subsequently depublished (*Avila v. P Biedess/AHCCCS*, 207 Ariz. 257 (2004)). *Avila* applied strict scrutiny to a wholly state-funded benefits program that simply adopted the same eligibility requirements as the federal program.  *Avila* found that the state program furthered "an important governmental interest for the state to have uniform eligibility criteria for both parts of the program, so that the significant difference between the two programs is income level."  *Avila*, 78 P.3d at 288.  *Avila* reasoned that "it would be an impractical and strained application of the Equal Protection Clause to bar a state from using federal eligibility criteria for a state program when a mandatory federal policy applies to one portion of a program

and the state merely acts to implement uniform rules of alien eligibility for another part of the same program." *Id.*

      *Avila* is not controlling (much less persuasive, or even good law).  The court rejects that a State's desire to have uniform eligibility requirements for both state and federally-funded programs is a compelling interest, and in any event Defendants did not mirror the federal eligibility requirements for Medicaid in creating BHH.  Accordingly, the court DENIES Defendants' Motion to Dismiss Plaintiffs' Equal Protection claim.

**B.    ADA**

      The Complaint asserts that Defendants are discriminating against disabled Plaintiffs by requiring them to seek care in a hospital setting, which is not the most integrated setting appropriate to meet their needs.  Compl. ¶ 46. Defendants summarily argue that Plaintiffs have failed to state a violation of the ADA because Plaintiffs are not qualified individuals with a disability and the Complaint fails to allege any denial of benefits to Plaintiffs by reason of their disabilities.  Defs.' Mot. at 30.  Defendants have not carried their burden.

      Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or

be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To prove

that a public service or program violates the ADA, a plaintiff must show: (1) she is

a "qualified individual with a disability;" (2) she was either excluded from

participation in or denied the benefits of a public entity's services, programs, or

activities or was otherwise discriminated against by the public entity; (3) the

service, program, or activity receives federal financial assistance; and (4) such

exclusion, denial of benefits, or discrimination was by reason of plaintiff's

disability.  *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003).

      As to Defendant's first argument that Plaintiffs do not meet the first

element of an ADA claim, a "qualified individual with a disability" is defined as

"an individual with a disability who, with or without  reasonable modifications . . .

meets the essential eligibility requirements for the receipt of services or the

participation in programs or activities provided by a public entity."  42 U.S.C.

§ 12131(2).  Disabled COFA Residents are eligible for BHH and are therefore

qualified individuals with disabilities.[7]

      As to Defendants' assertion that Plaintiffs have not asserted a denial

---

[7]  It appears that Defendants misunderstand Plaintiffs' ADA claim.  Defendants argue that Plaintiffs' ADA claim is based on their exclusion from the Old Programs and that Plaintiffs are not qualified to participate in those programs.  While Plaintiffs' Equal Protection claim is focused on Plaintiffs' exclusion from the Old Programs, the court interprets Plaintiffs' ADA claim as directed to whether BHH provides care in the most integrated setting.  Accordingly, that Plaintiffs no longer qualify for the Old Programs is not relevant to the ADA claim.

of any benefit to Plaintiffs by reason of their disabilities, Defendants fail to address in any meaningful manner that Plaintiffs are asserting a claim for violation of the ADA's integration mandate, which requires public entities to administer their programs "in the most integrated setting appropriate to the needs of qualified persons with disabilities."  28 C.F.R. § 35.130(d).  In certain circumstances, a plaintiff may assert a violation of this integration mandate challenging state action that may unnecessarily risk institutionalization.  *See Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir. 2003) (denying motion for summary judgment where evidence established that imposition of cap on prescription medications would place participants in community-based program at high risk for premature entry into nursing homes in violation of ADA); *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1119-20 (N.D. Cal. 2009) (granting preliminary injunction where plaintiffs established that class members faced a severe risk of institutionalization as a result of losing services new health care plan eliminates); *Ball v. Rodgers*, 2009 WL 1395423, at *5 (D. Ariz. Apr. 24, 2009) (finding violation of the ADA where Defendants' "failure to provide Plaintiffs with the necessary services threatened Plaintiffs with institutionalization, prevented them from leaving institutions, and in some instances forced them into institutions in order to receive their necessary care").  Indeed, Plaintiffs assert that BHH's limitation of benefits

32

requires them to seek care in a hospital setting, which may be sufficient to state a claim for violation of the ADA.

The court therefore DENIES Defendants' Motion to Dismiss Plaintiffs' ADA claim.

## V.  **CONCLUSION**

Based on the above, the court DENIES Defendants' Motion to Dismiss as to Plaintiffs' claims directed to COFA Residents.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 10, 2010.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Korab et al. v. Koller et al.*, Civ. No. 10-00483 JMS/KSC, Order Denying Defendants' Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted as to COFA Residents