IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TONY KORAB, TOJIO CLANTON, and KEBEN ENOCH, each individually and on behalf of those persons similarly situated,<br><br>     Plaintiffs,<br><br> vs.<br><br>LILLIAN B. KOLLER, in her official capacity as Director of the State of Hawaii, Department of Human Services, and KENNETH FINK, in his official capacity as State of Hawaii, Department of Human Services, Med-QUEST Division Administrator,<br><br>     Defendants.<br>_____ | CIVIL NO. 10-00483 JMS/KSC<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

**<u>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

**I.  <u>INTRODUCTION</u>**

On August 23, 2010, Plaintiffs filed this class action asserting claims against Lillian Koller, in her official capacity as Director of the State of Hawaii, Department of Human Services ("DHS"), and Kenneth Fink, in his official capacity as State of Hawaii, DHS, Med-QUEST Division Administrator

(collectively "Defendants")[1] challenging DHS's implementation of a new health care benefits program, Basic Health Hawaii ("BHH"), which Defendants created for non-pregnant adults residing in Hawaii under a Compact of Free Association ("COFA") with the United States who are ineligible for the same health benefits as other Hawaii residents ("COFA Residents"), and non-pregnant immigrants residing in Hawaii, age nineteen or older, who have been United States residents for less than five years and who are ineligible for the same health benefits as other Hawaii residents ("New Residents").  Plaintiffs are COFA Residents who bring this action on behalf of themselves and others similarly situated, asserting that BHH violates (1) the Equal Protection Clause of the Fourteenth Amendment because it provides less health benefits than the State of Hawaii's (the "State") Medicaid program offered to citizens and certain qualified aliens, and (2) the Americans with Disabilities Act (the "ADA") because BHH is not administered in the most integrated setting appropriate to meet their medical needs.

Currently before the court is Plaintiffs' Motion for Preliminary Injunction, in which they seek an injunction preventing Defendants from excluding COFA Residents from the State Medicaid program.  Plaintiffs argue that

---

[1] The parties have stipulated that "Defendants" means Defendants in their official capacities as well as their officers, agents, servants, and employees.

Defendants' policy of denying COFA Residents access to the same health benefit programs as United States citizens and other qualified aliens violates the Equal Protection clause of the Fourteenth Amendment and is causing irreparable injury to COFA Residents who cannot receive medical assistance they would otherwise receive under the State Medicaid program.[2]  Based on the following, the court finds that COFA Residents have a high likelihood of success on the merits of proving their Equal Protection claim, and that the likelihood of irreparable harm to COFA Residents without an injunction outweighs any relative hardship to Defendants. The court therefore GRANTS Plaintiffs' Motion for Preliminary Injunction.

## II.  BACKGROUND

**A.     Factual Background**

Medicaid is a cooperative federal-state program that provides federal funding for state medical services to the poor, disabled, and others in need.  42 U.S.C. § 1396 *et seq*.  Up until the Personal Work Opportunities Reconciliation Act of 1996 ("PRWORA"), COFA Residents were granted access to benefits under Medicaid, with the costs jointly paid by the federal and State government.  The PRWORA changed that arrangement, however, by excluding COFA Residents

---

[2] Although the briefing also addressed Plaintiffs' claims as they relate to New Residents and Plaintiffs' ADA claim, Plaintiffs subsequently withdrew their request for injunctive relief as to the New Residents and the ADA claim without prejudice.  *See* Doc. No. 32.

from federal Medicaid funding. Instead, the PRWORA left it up to the states to determine for themselves whether to provide funding to these individuals based solely on State funding. *See* 8 U.S.C. § 1622(a).

After the PRWORA went into effect, the State decided to continue providing COFA Residents with the same level of medical assistance benefits that they would have received if they were U.S. citizens. *See* Doc. No. 29 ¶ 1. Rather than adopt any administrative rules to create a state-funded medical assistance program, the State instead created a de facto state-funded medical assistance program by continuing to provide medical assistance benefits to COFA Residents and paying for those benefits entirely with State funds. *See id.* ¶¶ 2-3. So long as COFA Residents met the income and asset eligibility requirements for Hawaii's Federal Medicaid program, they received the same benefits as those provided to U.S. citizens. *Id.* ¶ 5. As such, COFA Residents were eligible to participate in the State's QUEST, Quest Expanded Access ("QExA"), QUEST-Net, QUEST-ACE, fee-for-service, and the State of Hawaii Organ and Tissue Transplant ("SHOTT") programs (the "Old Programs").

Allowing COFA Residents to participate in the Old Programs assisted eligible COFA Residents in seeking treatment that they could not receive in COFA countries. Compared to the general population of the United States, COFA

Residents have higher than average prevalence of several serious medical conditions including certain cancers and diabetes mellitus.  *See* Dr. Neal Palafox Decl. ¶ 4.  Medical facilities in COFA countries, however, do not have the capability or capacity to treat serious health conditions -- no COFA country has any facility that provides chemotherapy or radiation therapy to cancer patients, and there are only a few dialysis machines to be found in these countries.  *Id.* ¶ 5.

As of July 1, 2010, Defendants disenrolled COFA Residents who were not pregnant and who were age nineteen years or older and were not receiving long-term care services or had not recently received an organ transplantation from the Old Programs, and enrolled them in BHH, a health care benefits program for COFA Residents and New Residents.  Compared to the Old Programs for which the COFA Residents were previously qualified, BHH provides only limited care.[3]  For example, while QUEST and QExA provide comprehensive medical and behavioral health benefits and all necessary prescription drugs without limit, BHH limits patients to no more than ten days of medically necessary inpatient hospital care per year, twelve outpatient visits per year, six mental health visits, and a maximum of four medication prescriptions per calendar month.  Doc.

---

[3] In addition to the limitations discussed below, enrollment in BHH is capped at 7,000 statewide, and an open application period will not occur until enrollment drops below 6,500.  This Order does not address, and should not be construed to address, the impact of this Order on an open enrollment application period under Hawaii Administrative Rule § 17-1722.3-10.

5

No. 24 ¶¶ 14-17, 20, 23.  BHH covers dialysis treatments as an emergency medical service only, *see* Defs.' Ex. A, does not cover cancer treatments beyond the benefits provided to all members of BHH, and does not allow access to the State's organ and tissue transplant program, "SHOTT."  Doc. No. 24 ¶¶ 18, 24.

Due to these limitations on BHH, doctors have found that they cannot provide adequate care to COFA Residents through BHH.  For example,[4] COFA Residents with chronic illnesses are typically prescribed more than the four-prescriptions-per-month limit imposed by BHH, but cannot afford to pay for non-covered prescriptions out of pocket.  *See* Palafox Decl. ¶ 11; *see also* Dr. Wilfred Alik Decl. ¶¶ 11-12; Dr. Ritabelle Fernandes Decl. ¶ 16.  As a result, doctors are prioritizing medications and/or providing samples when available, and some patients have gone without needed prescriptions.  Dr. Seji Yamada Decl. ¶ 10; Dr. Joseph Humphrey Decl. ¶ 10; Fernandes Decl. ¶ 16.  As another example, cancer patients will exhaust BHH's yearly limit of only twelve outpatient visits within three to four months.  *See* Palafox Decl. ¶ 11; *see also* Alik Decl. ¶¶ 9, 15.  Finally, while Defendants have worked to streamline approval for emergency dialysis treatments by creating a one-page form, implementing fast

---

[4] Plaintiffs provided numerous examples displaying how BHH is harming and/or causing extreme hardship to COFA Residents.  Defendants do not dispute this evidence, and the court's description of Plaintiffs' evidence is not exhaustive.

approval responses, and covering drugs administered during the procedure, Dr. Anthea Wang Decl. ¶¶ 9, 10, 12, BHH is still inadequate in covering the care necessary for these patients -- before dialysis can even begin, patients require up to five or six doctor visits.  *See* Alik Decl. ¶ 13; Fernandes Decl. ¶ 18.

Plaintiffs have also presented evidence of multiple, specific instances where the limitations of BHH are compromising the care provided to COFA Residents.  *See*, *e.g.*, Humphrey Decl. ¶¶ 12-15; Yamada Decl. ¶¶ 10-12; Fernandes Decl. ¶¶ 18-23.  For example, Tojio Clanton, a kidney transplant recipient, attended three doctor visits and took ten prescriptions per month prior to BHH, but now has stopped taking four of his medications (paying for two medications out of pocket), which caused him to go into kidney failure and spend fourteen days in the hospital.  Clanton has now used up all of his doctor visits and cannot afford to pay for doctor visits or other prescriptions.  *See generally* Tojio Clanton Decl.  Tony Korab, a dialysis patient, takes approximately fifteen prescriptions per month, but as a result of his enrollment into BHH, he must now prioritize his prescriptions and he is no longer eligible for a kidney transplant through the SHOTT program.  *See generally* Tony Korab Decl.

///

///

B.     **Procedural Background**

On August 23, 2010, Plaintiffs filed this action, alleging claims against Defendants for violations of the Equal Protection Clause and the ADA.

On September 9, 2010, Defendants filed a Motion to Dismiss. On September 13, 2010, Plaintiffs filed a Motion for Preliminary Injunction. On October 4, 2010, Defendants filed their Opposition to the Motion for Preliminary Injunction, and Plaintiffs filed their Opposition to the Motion to Dismiss on October 5, 2010. Replies were filed on October 12, 2010. On October 28, 2010, the parties filed declarations of direct testimony for the preliminary injunction hearing, and a joint stipulation of facts. *See* Doc. No. 24.

A hearing was held on November 2, 2010, in which the court deferred hearing argument on the Motion for Preliminary Injunction pending resolution of several issues. On November 5, 2010, the parties filed a stipulation regarding Hawaii's laws and/or policies as to health benefits for COFA Residents. *See* Doc. No. 29. On November 10, 2010, the court denied Defendants' Motion to Dismiss. *See Korab v. Koller*, 2010 WL 4688824 (D. Haw. Nov. 10, 2010)

On November 24, 2010, the parties stipulated, and the court ordered, that this action be certified and maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), with the named Plaintiffs as class representatives.

8

The class is defined as: "all non-pregnant adults residing in Hawaii under the Compact of Free Association with the United States who are ineligble for the same health benefits as other Hawaii residents."

### III. STANDARD OF REVIEW

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002); *see also Burgess v. Forbes*, 2009 WL 416843, at *2 (N.D. Cal. Feb. 19, 2009); *Magnuson v. Akhter*, 2009 WL 185577, at *1 (D. Ariz. Jan. 27, 2009).

"A preliminary injunction is an extraordinary and drastic remedy [that] is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690 (2008) (citation and quotation signals omitted). In *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008), the Supreme Court explained that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." So long as all four parts of the *Winter* test are applied, "a preliminary injunction [may] issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of

hardships tips sharply in [plaintiff's] favor.'"⁵ *Alliance for Wild Rockies v. Cottrell*, --- F.3d ----, 2010 WL 3665149, at *4 (9th Cir. Sept. 22, 2010) (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). "In other words, 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.*

## IV. **DISCUSSION**

The court applies *Winter* to determine the following preliminary injunction considerations: (1) Plaintiffs' likelihood of success, (2) irreparable injury in the absence of preliminary relief, (3) the balance of equities, and (4) whether an injunction is in the public interest.

///

///

---

⁵ A higher standard applies to a mandatory preliminary injunction, which "orders a responsible party to take action," as opposed to a prohibitory preliminary injunction, which "preserves the status quo pending a determination of the action on the merits." *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). The status quo means "the last, uncontested status which preceded the pending controversy." *Id.* (citation omitted). The parties have not briefed whether the facts before the court require the entry of a mandatory preliminary injunction, and the court need not determine whether Plaintiffs seek a mandatory injunction -- even if the status quo were the benefits offered by BHH, the court finds that a mandatory injunction is warranted given the serious damage that COFA Residents will face without access to the State Medicaid program. *See id.* (stating that "[m]andatory injunctions should not be "granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages" (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980))).

A.     **Likelihood of Success on the Merits**

Plaintiffs assert that Defendants' determination that COFA Residents should no longer receive the same benefits as U.S. citizens violates the Equal Protection Clause because it discriminates between U.S. citizens who may participate in the Old Programs, and COFA Residents who may receive benefits under BHH only. As the court found in its November 10, 2010 Order Denying Defendants' Motion to Dismiss, Defendants' decision to exclude COFA Residents from the Old Programs is subject to strict scrutiny, as opposed to the rational basis review urged by Defendants. *See Korab*, 2010 WL 4688824, at *4-12.

Applying strict scrutiny, *i.e.*, requiring Defendants to show that their classification "advance[s] a compelling state interest by the least restrictive means available," *Bernal v. Fainter*, 467 U.S. 216, 219 (1984), the court finds that Plaintiffs have shown a high degree of likelihood of success on the merits.[6] As the November 10, 2010 Order explained, Defendants have failed to identify *any* particular State interest that is advanced by their decision to exclude COFA Residents from the Old Programs.[7] Further, while the court recognizes that BHH

---

[6] Indeed, Defendants conceded at the November 2, 2010 hearing that if the court denied their Motion to Dismiss, a preliminary injunction should follow applying a strict scrutiny review.

[7] As explained in the November 10, 2010 Order, the court rejects Defendants' argument under *Avila v. Biedess*, 78 P.3d 280 (Ariz. Ct. App. 2003) (depublished at *Avila v. P Biedess/AHCCCS*, 207 Ariz. 257 (2004)), that they have established the strict scrutiny standard.

11

was created in response to the State's budget crisis, when applying strict scrutiny, the "justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens." *Graham v. Richardson*, 403 U.S. 365, 376 (1971) (quotation and citation signals omitted).

In sum, Defendants have failed to proffer any plausible explanation of how they can meet the strict scrutiny standard and without any such explanation, the courts finds that Plaintiffs have established a likelihood of success on the merits. This factor weighs in favor of granting a preliminary injunction.

**B.     Irreparable Harm**

Plaintiffs have shown a strong likelihood of irreparable harm if a preliminary injunction is not granted. Plaintiffs have submitted compelling evidence that BHH's limited coverage for doctors' visits, prescriptions, and other critical services is causing COFA Residents to forego much needed treatment because they cannot otherwise afford it. This lack of treatment clearly supports a finding of irreparable harm. *See Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982) (holding that possibility that plaintiffs would be denied Medicaid benefits sufficient to establish irreparable harm); *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 997 (N.D. Cal. 2010) (finding that "the reduction or elimination of public medical benefits is sufficient to establish irreparable harm to those likely to be

affected by the program cuts"); *Newton-Nations v. Rogers*, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004) (citing *Beltran* and finding irreparable harm shown where Medicaid recipients could be denied medical care as a result of their inability to pay increased co-payments to medical service providers).

Accordingly, this factor also weighs in favor of granting a preliminary injunction.

### C.     Balance of the Equities

A preliminary injunction will effectively maintain the status quo that existed before Defendants implemented BHH for COFA Residents. In comparison, Plaintiffs will suffer irreparable harm without a preliminary injunction because they would be left without adequate medical coverage, which will force them to pay for treatment on their own or completely forego the treatment. In contrast, Defendants will incur the same costs and lose only the "cost savings" that they intended to receive as a result of switching COFA residents over to BHH. While the money Defendants save in implementing BHH is significant, it does not outweigh the physical and financial harm caused to COFA Residents. Accordingly, this factor also weighs in favor of Plaintiffs.

///

///

**D.     Public Interest**

Finally, the court finds that a preliminary injunction is in the public interest, but even it were neutral, the other factors clearly weigh in favor of granting the temporary restraining order.

**E.     Weighing the Factors**

Because all of the factors weigh in favor of granting Plaintiff's Motion for Preliminary Injunction, the court finds that Plaintiffs are entitled to relief.

## V.  **PRELIMINARY INJUNCTION**

Based on the above, the court GRANTS Plaintiffs' Motion for Preliminary Injunction.[8]  Specifically, the court orders as follows:

1.     For COFA Residents who presently are enrolled in BHH, Defendants shall reinstate the benefits that the COFA Resident was receiving through the Old Programs as of June 1, 2010, prior to being deemed into BHH effective July 1, 2010 pursuant to Hawaii Administrative Rule §17-1722.3-33, as amended.

---

[8] Before entering this Preliminary Injunction, the court asked the parties to meet and confer to determine whether they could agree on the language for a preliminary injunction. The following language was agreed to by the parties and is accepted by the Court as appropriate.

2.      Defendants shall give priority to processing the reinstatement of benefits for those COFA Residents who are enrolled in BHH and who were receiving benefits through the QExA or SHOTT programs.  These COFA Residents presently enrolled in BHH will be entitled to benefits effective December 15, 2010 and Defendants shall reimburse providers for any benefits provided on or after that date, regardless of when Defendants complete processing the re-enrollment documentation.  COFA Residents having QExA benefits reinstated will receive these benefits through the same health plan through which they previously received them.

3.      No later than January 1, 2011, Defendants shall complete the reinstatement of benefits for COFA Residents presently enrolled in BHH who were receiving QUEST benefits before being deemed into BHH.  COFA Residents having QUEST benefits reinstated will receive these benefits through the same health plan through which they previously received them.

4.      No later than February 1, 2011, Defendants shall reinstate benefits for COFA Residents who were enrolled in BHH and were receiving benefits through the QUEST-ACE or QUEST-Net programs.  COFA Residents having QUEST-ACE or QUEST-Net benefits reinstated will receive these benefits through the same health plan through which they previously received them.

    5. No later than January 15, 2011, Defendants shall complete the reinstatement of benefits for COFA Residents deemed into BHH who were disenrolled upon conclusion of the transition period for failing to meet BHH eligibility criteria.  However, COFA Residents in this group who received benefits through the QExA or SHOTT programs on June 1, 2010 will have these benefits reinstated effective December 15, 2010 as provided in paragraph 2, above.

    6. Effective December 15, 2010, Defendants shall accept and timely process applications for medical benefits from COFA Residents who are not presently enrolled in BHH.  Defendants shall not deny any application for medical assistance[9] from a COFA Resident with an application date on or after December 15, 2010 based on citizenship.  Upon meeting all medical assistance eligibility requirements that are applicable to United States citizens, other than citizenship, COFA Residents shall receive the benefits of the Old Program for which he/she is eligible.  However, for applications dated from December 15, 2010 through December 31, 2010, if the COFA Resident applicant is determined eligible to receive QUEST benefits, then the applicant will receive BHH benefits from the

---

   [9] The Department of Human Services, Med-QUEST Division ("MQD"), may be amending its medical assistance application to be titled "Application for Public Health Insurance."  This Preliminary Injunction Order shall apply to the MQD's application for federal or state funded medical assistance benefits, notwithstanding any changes to the application form.

date of eligibility through December 31, 2010 and will receive QUEST benefits beginning January 1, 2011.

7. Defendants shall publish notice in the Honolulu Star-Advertiser, The Maui News, Hawaii Tribune Herald, West Hawaii Today, and The Garden Island, announcing that the Defendants are accepting applications for medical benefits from COFA Residents as provided in paragraph 6, above. Defendants shall consult with Lawyers for Equal Justice, to the extent practicable given the time constraints of this Order, on the wording of the public notice.

8. Defendants shall make every effort to identify COFA Residents who were disenrolled from the Old Programs because of a change in pregnancy status or who turned 19 years old after July 1, 2010, but were not enrolled into BHH because of the cap on BHH enrollment. Once identified, Defendants shall separately notify these individuals of their right to apply for medical assistance benefits.

9. Defendants shall take steps to assure that medical providers in the State of Hawai`i are aware that COFA Residents are entitled to benefits under the Old Programs so that they receive the benefits to which they are entitled, even if Defendants have not completed processing the re-enrollment documentation.

No bond shall be required pursuant to Fed. R. Civ. P. 65(c). This Preliminary Injunction Order shall be binding as provided in Fed. R. Civ. P. 65(d) and shall remain in effect for the duration of this litigation, until further order of the court.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 13, 2010.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Korab et al. v. Koller et al.*, Civ. No. 10-00483 JMS/KSC, Order Granting Plaintiffs' Motion for Preliminary Injunction