IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| TONY KORAB, TOJIO CLANTON, KEBEN ENOCH, CASMIRA AGUSTIN, ANTONIO IBANA, AGAPITA MATEO, and RENATO MATEO, each individually and on behalf of those persons similarly situated, | ) ) ) ) ) ) ) ) ) | CIVIL NO. 10-00483 JMS/KSC  ORDER (1) DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING NEW RESIDENTS; AND (2) DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| PATRICIA MCMANAMAN, in her official capacity as Director of the State of Hawaii, Department of Human Services, and KENNETH FINK, in his official capacity as State of Hawaii, Department of Human Services, Med-QUEST Division Administrator, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## ORDER (1) DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING NEW RESIDENTS; AND (2) DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

On April 5, 2010, Plaintiffs filed this class action asserting claims

against Patricia McManaman, in her official capacity as Director of the State of

Hawaii, Department of Human Services ("DHS"),[1] and Kenneth Fink, in his official capacity as State of Hawaii, DHS, Med-QUEST Division Administrator (collectively "Defendants") challenging DHS's implementation of a new health care benefits program, Basic Health Hawaii ("BHH"), which Defendants created for non-pregnant citizens, age nineteen or older, of countries with Compacts of Free Association ("COFA") with the United States who are lawfully residing in Hawaii ("COFA Residents"), and non-pregnant immigrants, age nineteen or older, who have been United States residents for less than five years ("New Residents"). Plaintiffs are COFA Residents and New Residents who bring this action on behalf of themselves and others similarly situated, asserting that BHH violates (1) the Equal Protection Clause of the Fourteenth Amendment because it provides less health benefits than the State of Hawaii's (the "State") Medicaid program offered to citizens and certain qualified aliens, and (2) the Americans with Disabilities Act (the "ADA") because BHH is not administered in the most integrated setting appropriate to meet their medical needs.

   In a first round of motions directed to COFA Residents' claims, the court denied Defendants' Motion to Dismiss, *see Korab v. Koller*, 2010 WL

---

[1] This action was originally brought against Lillian Koller, who Patricia McManaman subsequently replaced as Director of DHS.

4688824 (D. Haw. Nov. 10, 2010) ("*Korab COFA I*"), and granted Plaintiffs'

Motion for Preliminary Injunction. *Korab v. Koller*, 2010 WL 5158883 (D. Haw.

Dec. 13, 2010) ("*Korab COFA II*"). Currently before the court is a second set of

motions directed solely to New Residents' claims. Based on the following, the

court finds that the reasoning denying Defendants' Motion to Dismiss as to COFA

residents applies with equal force to New Residents and therefore DENIES

Defendants' Motion for Summary Judgment. The court further finds, however,

that Plaintiffs have not established that they are entitled to preliminary relief and

therefore DENIES Plaintiffs' Motion for Preliminary Injunction.

## II. BACKGROUND

**A.     Factual Background**

As the court did previously, *see Korab COFA I*, 2010 WL 4688824, at

*1-2, the court first outlines the history of Medicaid and health care in Hawaii as

relevant to New Residents' claims, and then addresses the facts relevant to their

claims.

### 1.     History of Medicaid Benefits Provided to Aliens in Hawaii

Medicaid is a cooperative federal-state program that provides federal

funding for state medical services to the poor, disabled, and others in need. 42

U.S.C. § 1396 *et seq*. "State participation is voluntary; but once a State elects to

join the program, it must administer a state plan that meets federal requirements."

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004) (citations omitted).

The Personal Work Opportunities Reconciliation Act of 1996

("PRWORA") changed Medicaid law significantly. As is relevant to this action,[2]

the PRWORA limited Medicaid availability to aliens in an effort to, among other

things, "remove the incentive for illegal immigration provided by the availability

of public benefits" and encourage "self-sufficiency." 8 U.S.C. § 1601(1), (6). The

PRWORA divided aliens into two groups -- qualified and non-qualified. Qualified

aliens include lawful permanent residents, designated refugees, aliens granted

asylum, and certain other specified categories of lawfully present aliens.

8 U.S.C. § 1612(b); *id.* § 1641(b). Qualified aliens may generally receive

Medicaid if they entered the United States prior to August 22, 1996, or otherwise

have lived in the United States for at least five years.[3] 8 U.S.C. § 1613(a). In other

words, qualified aliens entering the United States after August 22, 1996 must

generally wait five years to become eligible for Medicaid. In contrast,

nonqualified aliens are not eligible, even after the five-year waiting period, for

---

[2] The PRWORA provided comprehensive welfare reform, but the court is concerned with Title IV only, which addresses eligibility of aliens for certain benefits.

[3] Refugees, aliens granted asylum, and certain other groups are exempted from the five-year limitation. 8 U.S.C. § 1613(b).

Medicaid benefits. "New Residents," as defined by the First Amended Complaint ("FAC"), includes "non-pregnant immigrants, age nineteen or older, who have been United States residents for less than five years." *See* Doc. No. 57, FAC ¶ 1.

The PRWORA provides that states may also create benefits programs outside of Medicaid, and if they do, state benefits programs may not exclude certain groups of aliens, 8 U.S.C. § 1622(b), but must exclude other certain groups. *Id.* § 1621(a). As for a third group of aliens not qualified for federal benefits -- which includes New Residents (*i.e.*, qualified aliens who do not meet the five-year durational residency requirement for Medicaid eligibility or who are nonimmigrants as provided in 8 U.S.C. § 1101) -- the PRWORA gives discretion to the states to determine eligibility for state benefits. Specifically, 8 U.S.C. § 1622(a) provides:

> Notwithstanding any other provision of law . . . , a State is authorized to determine the eligibility for any State public benefits of an alien who is a qualified alien (as defined in section 1641 of this title), a nonimmigrant under the Immigration and Nationality Act [8 U.S.C. § 1101 et seq.], or an alien who is paroled into the United States under section 212(d)(5) of such Act [8 U.S.C. § 1182(d)(5)] for less than one year.

Thus, as a result of the PRWORA, federal funds are no longer available for New Residents to participate in Medicaid, but states on their own may choose to provide medical coverage for them.

## 2.     *Hawaii's Health Programs*

After the PRWORA went into effect, neither New Residents nor

COFA Residents were eligible for Medicaid.  The State nonetheless allowed

COFA Residents to receive the same medical benefits provided through Medicaid

to citizens and qualified aliens who meet the durational residency requirement,

such as the State's QUEST, QExA, QUEST-Net, QUEST-ACE, fee-for-service,

and SHOTT programs ("Old Programs").[4]  *See Korab COFA I*, 2010 WL 4688824,

at *2.

The State did not, however, cover New Residents in the Old Programs

as they did for COFA Residents.  *See* Doc. No. 62-3, Fink Decl. ¶ 8.  Instead, the

Hawaii legislature appropriated funds for providers who would otherwise have

provided uncompensated care to New Residents in a program called Hawaii

Immigrant Health Initiative ("IHI").  Doc. No. 66-1, Fink Decl. ¶ 8, Doc. No. 67-4,

Pls.' Ex. B.  Under IHI, New Residents could receive primary care, preventative

care, specialty care, prescription drugs, Tuberculin testing and immunizations, and

---

[4]  As stipulated by the parties, the State did not adopt any administrative rules to create a state-funded medical assistance program, and instead created a de facto state-funded medical assistance program by continuing to provide medical assistance benefits to COFA Residents and paying for those benefits entirely with State funds.  *See* Doc. No. 29 ¶¶ 2-3.  COFA Residents used the same application as that used for applicants seeking Medicaid.  *Id.* ¶ 4.  So long as the COFA Resident met the income and asset eligibility requirements for Hawaii's Federal Medicaid program, the COFA Resident received the same benefits as those provided under the Old Programs.  *Id.* ¶ 5.

gynecological services, but not inpatient care and emergency care.[5]  *See* Doc. No. 66-1, Fink Decl. ¶ 9, Doc. No. 67-4, Pls.' Ex. B.

On July 1, 2010, DHS Med-Quest implemented BHH -- a medical benefits program for COFA Residents and New Residents who are age nineteen or older and not pregnant and who are not eligible for federal Medicaid assistance. Haw. Admin. R. ("HAR") § 17-1714-2.  As of this date, DHS has disenrolled COFA Residents who were not pregnant and who were age nineteen or older from the Old Programs and enrolled them in BHH.  As to New Residents, HAR § 17-1722.3-33(b) deemed those who received financial assistance and who meet the eligibility requirements into BHH.  *See also* Doc. No. 62-3, Fink Decl. ¶ 11.

Enrollment in BHH is capped at 7,000 statewide, and an open application period will not occur until enrollment drops below 6,500.  HAR § 17-1722.3-10.  About 7,000 non-immigrants, mostly COFA Residents, were transferred from the Old Programs to BHH.[6]  *See* Doc. No. 67-5, Pls.' Ex. C.  The

---

[5]  The parties dispute whether IHI is a "medical assistance program," given that there is no eligibility determination by the State and IHI does not exist through statute or administrative rule.  *See* Doc. No. 66-1, Fink Decl. ¶ 12.  It is also unclear whether IHI currently exists -- Defendants state that funding was approved only through the State fiscal year 2010.  *See id.* ¶ 14. Ultimately, these facts do not affect the court's determinations of these motions because the issue is not whether the State violated Plaintiffs' Equal Protection rights by implementing IHI, but rather whether the State violated Plaintiffs' Equal Protection rights by refusing to allow them to participate in the Old Programs.

[6]  The December 13 COFA Order required Defendants to reinstate the benefits that the
(continued...)

parties do not dispute that BHH provides limited care as compared to the Old Programs. *See Korab*, 2010 WL 4688824, at *2-3 (describing differences between the Old Programs and BHH).

Plaintiffs have presented evidence of several specific instances where the named New Resident class representatives have been denied State health care benefits and as a result are unable to receive needed health care and/or are facing significant bills due to a lack of coverage. For example, Casmira Agustin, a lawful permanent resident since 2009, received emergency surgery for a cyst on her ovary and without coverage, is facing medical bills totaling almost $50,000. *See* Doc. No. 63-2, Casmira Agustin Decl. Antonio Ibana, a resident since 2010, was denied medical insurance coverage through Med-Quest, and has been foregoing needed eye surgery. Doc. No. 63-3, Antonio Ibana Decl. Renato Mateo, a resident since September 2006, has no insurance coverage for his chemotherapy treatments, and the office where he receives treatments has denied treating him after he accrued more than $85,000 in bills. Doc. No. 63-4, Renato Mateo Decl. Agapita Mateo, Renato Mateo's wife, has foregone insulin for her diabetes, causing her vision to become cloudy, and she cannot receive needed back surgery because she cannot

---

[6](...continued)
COFA Residents were receiving through the Old Programs, *see Korab COFA II*, 2010 WL 5158883, at *5, and as a result, it is unclear whether BHH opened enrollment after the December 13 COFA Order. Neither party presents any evidence addressing this issue.

afford the necessary specialists.  Doc. No. 63-5, Agapita Mateo Decl.  Plaintiffs did not submit any evidence regarding other putative class members beyond the class representatives.

**B.      Procedural Background**

On August 23, 2010, Plaintiffs filed this action, alleging claims for violations of the Equal Protection Clause and the ADA.

A first round of Motions addressed COFA Residents' claims. Specifically, on November 10, 2010, the court denied Defendants' Motion to Dismiss COFA Residents' claims (the "November 10 COFA Order"), *Korab COFA I*, 2010 WL 4688824; and on December 13, 2010, the court granted Plaintiff COFA Residents' Motion for Preliminary Injunction (the "December 13 COFA Order").  *Korab COFA II*, 2010 WL 5158883.

As to the present Motions regarding New Residents, on April 28, 2011, Defendants filed their Motion for Partial Summary Judgment, and Plaintiffs filed a Motion for Preliminary Injunction.  Oppositions were filed on May 9, 2011, and Replies were filed on May 16, 2011.  A hearing was held on June 27, 2011.

///

///

///

# III.  STANDARDS OF REVIEW

## A.    Summary Judgment

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal

quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

## B.     Motion for Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy [that] is never awarded as of right." *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008) (citation and quotation signals omitted). In *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), the Supreme Court explained that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed

on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." So long as all four parts of the *Winter* test are applied, "a preliminary injunction [may] issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (quoting *Clear Channel Outdoor, Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003)).

There are two types of preliminary injunctions -- a prohibitory injunction that "preserve[s] the status quo pending a determination of the action on the merits[, versus a] mandatory injunction [that] orders a responsible party to 'take action.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citations and quotations omitted). "A mandatory injunction "'goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.'" *Id.* (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)). The status quo means "the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879.

Where a claimant seeks a mandatory injunction, "courts should be

extremely cautious about issuing a preliminary injunction," and "should deny such relief 'unless the facts and law clearly favor the moving party.'" *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319-20 (9th Cir. 1994) (quoting *Anderson*, 612 F.2d at 1114). In general, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Anderson*, 612 F.2d at 1115; *see also Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (describing that "the movant must make a heightened showing of the four factors" (citation and quotation signals omitted)).

## IV.  DISCUSSION

### A.    Motion for Summary Judgment

Defendants argue that Plaintiffs have failed to establish a genuine issue of material fact in support of their claims pursuant to the Equal Protection Clause and the ADA.  The court addresses these claims in turn.

#### 1.    *Equal Protection*

New Resident Plaintiffs assert that Defendants' implementation of BHH violates the Equal Protection clause of the Fourteenth Amendment because it discriminates between citizens and certain groups of aliens who may receive Medicaid, and New Residents who may receive BHH's lesser benefits only (when

and if BHH allows additional enrollment).  *See* FAC ¶ 56.  In comparison,

Defendants argue that the State's creation of BHH is subject to rational basis

review because Congress, not the State, excludes certain groups of aliens from

participating in Medicaid and the State does not have an obligation to create a

separate benefits program for aliens with equal benefits.

These arguments mirror those raised by the parties as to COFA

Residents, which the November 10 COFA Order addressed and found that strict

scrutiny applies.  As between the two Motions, there are certainly some

distinctions.  The November 10 COFA Order addressed a Motion to Dismiss as

opposed to a Motion for Summary Judgment, and there are factual differences

between COFA Residents and New Residents.  For example, Defendants allowed

COFA Residents to participate in the Old Programs for fourteen years until

implementation of BHH in 2010, whereas New Residents received medical care

through IHI.  The parties further dispute precisely what medical benefits New

Residents received prior to BHH and how many New Residents (if any) were

deemed into BHH.  These distinctions, however, are ultimately not controlling

because the issue in both Motions boils down to a legal question -- what is the

standard of review for the State's implementation of BHH, where citizens and

qualified residents receive more comprehensive benefits under the Old Programs

and COFA Residents and New Residents can participate in BHH only?

The November 10 COFA Order outlined the legal framework for determining the standard of review for classification based on alienage, and explained that due to the PRWORA, the State's decision to no longer provide COFA Residents access to the same medical benefits provided to citizens appeared to be neither a purely state decision subject to strict scrutiny, nor a federal decision subject to rational basis review. *Korab COFA I*, 2010 WL 4688824, at *4-7. Thus, the issue became "whether the PRWORA validly granted states the authority to classify individuals based on alienage in determining eligibility for [BHH and the Old Programs]." *Id.* at *7. The November 10 COFA Order answered this question in the negative -- the PRWORA could validly allow states to classify based on alienage only if it established a uniform rule for the states to follow. Because the PRWORA gave states a choice in determining what benefits to provide certain groups of aliens, the November 10 COFA Order concluded that the PRWORA did not create a uniform rule for states to follow such that the State's implementation of BHH was subject to strict scrutiny. *Id.* at *8-10.

The reasoning of the November 10 COFA Order applies equally to New Residents. The decision to distinguish between citizens and qualified aliens who may participate in the Old Programs versus COFA Residents and New

Residents who may participate in BHH is a classification based on alienage. Although Defendants attempt to characterize this classification instead as one based on Medicaid eligibility, such characterization is one based on semantics and not realities, especially where the State provided COFA Residents access to the Old Programs for fourteen years. The decision to classify based on alienage was a choice by the State and not mandated by the federal government -- although the PRWORA prevents certain groups of aliens from participating in Medicaid, Medicaid is a voluntary program, jointly funded by State and federal dollars and jointly administered by the State and federal government. The PRWORA also allows states to determine for themselves whether to provide medical benefits to aliens excluded from Medicaid solely through state funds. As the November 10 COFA Order found, this flexibility results in a lack of uniformity, which prevents the State's decision from being cloaked in rational basis review.

Despite the November 10 COFA Order and its application to New Residents, Defendants largely rehash the same arguments they raised before; the court need not further explain the applicability of November 10 COFA Order to reject these arguments. The court therefore focuses on Defendants' argument not previously considered by the court -- that the court should follow the reasoning of *Hong Pham v. Starkowski*, 16 A.3d 635 (Conn. 2011), a case issued after the

November 10 COFA Order in which the Connecticut Supreme Court overruled a Connecticut Superior Court decision, 2009 WL 5698062, at *16 (Conn. Super. Dec. 18, 2009), which the November 10 COFA Order had cited with approval. For a number of reasons, *Hong Pham* does not change the court's analysis.

As an initial matter, *Hong Pham* is only one of a number of cases addressing state decisions to cut back medical benefits programs provided to aliens, and the November 10 COFA Order analyzed the relevant caselaw available at the time. *See Korab COFA I*, 2010 WL 4688824, at *8. As the November 10 COFA Order explained, courts have fallen on both sides of the issue in determining the appropriate standard of review; *Hong Pham* hardly tips the balance in favor of rational basis review. Indeed, since the November 10 COFA Order, two other cases have applied strict scrutiny to state decisions cutting medical benefit programs to aliens. *See Pimentel v. Dreyfus*, 2011 WL 321778, at *4-5 (W.D. Wash. Jan. 28, 2011) (finding that the plaintiffs challenging Washington's decision to repeal state-funded food assistance program was subject to strict scrutiny because the PRWORA did not establish a uniform rule for the states to follow); *Finch v. Commonwealth Health Ins. Connector Auth.*, 946 N.E.2d 1262, 1277 (Mass. 2011) (holding that a state's exclusion of aliens from health insurance premium program was subject to strict scrutiny).

Turning to the substance of *Hong Pham*, the court finds its reasoning unpersuasive. *Hong Pham* addressed Connecticut's termination of a state program that provided medical assistance to qualified aliens who did not meet the five-year requirement to participate in Medicaid. According to *Hong Pham*, the relevant question was "whether the state program provides a benefit to citizens that it does not provide to some or all aliens because of their status as noncitizens." *Hong Pham*, 16 A.3d at 648. *Hong Pham* answered this question in the negative because the eliminated program did not provide benefits to citizens. In other words, "[b]ecause the state is not providing a benefit to citizens through that program that it denies to some or all aliens, the state cannot be discriminating against aliens in favor of citizens." *Id.* at 648.

*Hong Pham* further rejected that Connecticut's participation in Medicaid required it to provide an equivalent level of assistance to those that cannot participate in Medicaid. *Id.* at 649. Relying on other cases applying rational basis review (considered by the November 10 COFA Order), *Hong Pham* reasoned that "the equal protection clause does not require the state to treat individuals in a manner similar to how others are treated in a different program governed by a different government." *Id.* at 650. *Hong Pham* concluded that in any event, even if it compared the treatment of aliens ineligible for Medicaid

versus citizens, "the state's decision to participate in federal Medicaid does not draw a classification based on alienage but, instead, draws a classification based on an individual's eligibility for federal Medicaid." *Id.* at 659.

The court questions *Hong Pham's* premise that the issue can be limited to "whether the state program provides a benefit to citizens that it does not provide to some or all aliens because of their status as noncitizens." *Id.* at 648. By limiting the inquiry to a particular program on its own as opposed to a state's provision of medical benefits to its residents through various different programs generally, *Hong Pham* would allow a state to create separate programs that provide different benefits based on suspect classification (*i.e.*, alienage, race, gender). A state could, for example, create one medical benefits program with limited benefits for African Americans, and another program with greater benefits for Caucasians. Under *Hong Pham's* reasoning, there would apparently be no suspect classification based on race because neither individual program provides a benefit to one race that it does not provide to individuals of other races because of their race. Such an absurd (and insidious) result stands the Equal Protection clause on its head.

Unlike *Hong Pham*, the court finds that the relevant inquiry is whether the State's provision of medical benefits to its residents -- regardless of the specific contours of each individual program -- classifies based on alienage. Such inquiry

takes into account that the State affirmatively decided to create and spend State dollars on each benefits program. That one benefits program is partially funded by the federal government (*i.e.*, the Old Programs) is not controlling; as explained above, the State voluntarily participates and partially funds the program -- that the federal government is a partner with the State does not give the State a license to violate the Equal Protection clause. *See Graham v. Richardson*, 403 U.S. 365, 382 (1971) (explaining that "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause," and that while Congress has the power to "establish a uniform Rule of Naturalization," "[a] congressional enactment construed so as to permit state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs would appear to contravene this explicit constitutional requirement of uniformity").

Indeed, by categorizing the classification as one based on Medicaid eligibility as opposed to alienage, *Hong Pham* completely side-stepped the uniformity inquiry that was not only central to the November 10 COFA Order, but also a relevant inquiry in most cases addressing state medical benefits programs provided to aliens (even those that ultimately applied rational basis review). *See, e.g.*, *Pimentel*, 2011 WL 321778, at *4-5 (finding that the plaintiffs challenging

Washington's decision to repeal state-funded food assistance program was subject to strict scrutiny because the PRWORA did not establish a uniform rule for the states to follow); *Soskin v. Reinertson*, 353 F.3d 1242, 1256 (10th Cir. 2004) (holding that the PRWORA did not run afoul of the uniformity requirement when it is interpreted flexibly); *Ehrlich v. Perez*, 908 A.2d 1220, 1244 (Md. 2006) (holding that the PRWORA prescribes no uniform rule and applying strict scrutiny); *Finch*, 946 N.E.2d at 1276-77 (holding that strict scrutiny applies to state's exclusion of aliens from health insurance premium program because the PRWORA "does not require that States apply Federal eligibility requirements but instead merely declares that Federal policy will not be thwarted if States decide to discriminate against qualified aliens"); *Doe v. Comm'r of Transitional Assistance*, 773 N.E.2d 404, 410 (Mass. 2002) (holding that state statute incorporating eligibility requirements of the PRWORA is subject to rational basis review because the state did "nothing more than adopt the uniform Federal policy barring qualified aliens from receiving benefits from federally funded State programs until they have resided in the United States for five years"); *Aliessa ex rel. Fayad v. Novello*, 754 N.E.2d 1085, 1098 (N.Y. 2001) (rejecting that the PRWORA creates uniformity because "the States are free to discriminate in either direction -- producing not uniformity, but potentially wide variation based on localized or idiosyncratic

concepts of largesse, economics and politics").

The court therefore rejects that *Hong Pham* adds any new insight into the Equal Protection analysis that would change the court's conclusion that the reasoning of the November 10 COFA Order applies equally to New Residents as it does to COFA Residents.[7]  Accordingly, the court adopts the reasoning of the November 10 COFA Order and concludes that strict scrutiny applies to the State's implementation of BHH as to New Residents.

Because Defendants offer no argument that they are entitled to summary judgment if strict scrutiny applies, the court DENIES Defendants' Motion for Summary Judgment on Plaintiffs' Equal Protection claim.

### 2.     *ADA*

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To prove that a public service or program violates the ADA, a plaintiff must show: (1) she is a "qualified individual with a disability;" (2) she was either excluded from

---

[7] *Hong Pham* is also factually distinguishable from this case.  *Hong Pham* addressed Connecticut's termination of a state program that was available to aliens only.  In comparison, the State allowed both Medicaid-eligible residents as well as COFA Residents to participate in the Old Programs -- there was no separate program for COFA Residents.

participation in or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against by the public entity; (3) the service, program, or activity receives federal financial assistance; and (4) such exclusion, denial of benefits, or discrimination was by reason of plaintiff's disability. *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003).

Within this general framework, Plaintiffs are asserting a claim for violation of the ADA's integration mandate, which requires public entities to administer their programs "in the most integrated setting appropriate to the needs of qualified persons with disabilities." 28 C.F.R. § 35.130(d); *see also* FAC ¶¶ 62-64 (asserting that Defendants are discriminating against disabled New Resident Plaintiffs by requiring them to seek care in a hospital setting, which is not the most integrated setting appropriate to meet their needs). Although not well-developed in the law, in certain circumstances, a plaintiff may assert a violation of this integration mandate challenging state action that may unnecessarily risk institutionalization. *See Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir. 2003) (denying motion for summary judgment where evidence established that imposition of cap on prescription medications would place participants in community-based program at high risk for premature entry into nursing homes in violation of ADA); *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1119-

20 (N.D. Cal. 2009) (granting preliminary injunction where plaintiffs established that class members faced a severe risk of institutionalization as a result of losing services new health care plan eliminates); *Ball v. Rodgers*, 2009 WL 1395423, at *5 (D. Ariz. Apr. 24, 2009) (finding violation of the ADA where Defendants' "failure to provide Plaintiffs with the necessary services threatened Plaintiffs with institutionalization, prevented them from leaving institutions, and in some instances forced them into institutions in order to receive their necessary care").

Defendants seek summary judgment on this claim, raising a number of arguments, including that (1) Plaintiffs are not qualified individuals with disabilities; (2) Plaintiffs were not denied any benefits by reason of their disabilities; and (3) the ADA does not require the state to provide services where none were previously provided. The briefing on this claim, however, is limited and/or conclusory, which is ultimately unhelpful to the court where the caselaw does not clearly define the contours of such claim. The court therefore DENIES Defendants' Motion without prejudice to Defendants raising these arguments at a later time.

**B.      Motion for Preliminary Injunction**

Plaintiffs seek a preliminary injunction prohibiting Defendants from excluding New Residents from the Old Programs and from enrolling New

Residents in BHH. Doc. No. 63, Pls.' PI Mot. at 2. Based on the following, the court finds that Plaintiffs have failed to carry their burden to establish they are entitled to this relief.

### 1.     *Preliminary Injunctions and Class Certification*

The first problem with Plaintiffs' Motion for Preliminary Injunction is that Plaintiffs have not yet sought class certification for New Residents. Although Plaintiffs correctly point out that they *may* move for class-wide relief before moving to certify the class, injunctive relief is discretionary and "[c]ourts often refuse such relief until *after* the class is certified, because until then it may be difficult to determine the extent of benefits to the class and consequences to defendant if an injunction is granted." Schwarzer, Tashima and Wagstaffe, Fed. Civ. P. Before Trial, § 10:773 at 10-116 (TRG 2008); *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (recognizing that "injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification"); *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1984) ("A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court."). Absent class certification, the rule that "injunctive relief should be no more burdensome to the defendant than

necessary to provide complete relief to the plaintiffs" applies with special force.

*L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011).

Seeking class certification would have certainly assisted Plaintiffs in addressing the preliminary injunction inquiries. Although Plaintiffs submitted evidence regarding the possible harm to the named class representatives, they presented no evidence from which the court can conclude that this harm is typical and common to the entire class. Further, Plaintiffs have provided the court absolutely *no idea* of the size of the class of "New Residents." Their failure to provide any ballpark idea of the size of the class may be due to the various different definitions Plaintiffs have provided of "New Residents." For example, the FAC defines New Residents as "non-pregnant immigrants, age nineteen or older, who have been United States residents for less than five years." *See* Doc. No. 57, FAC ¶ 1. In their Motion for Preliminary Injunction, however, Plaintiffs define "New Residents" as "resident aliens lawfully in the United States for less than five years." Doc. No. 63 at 2. Finally, in their Reply Brief, Plaintiffs assert that "[t]he New Resident class includes 'qualified immigrants' under PRWORA" as well as "'nonimmigrants' or other lawfully-resident aliens who are not 'qualified immigrants.'" Doc. No. 69, Pls.' PI Reply at 7 n.5. Despite using these different terms, at no point do Plaintiffs define "immigrants," "aliens," or "non-

immigrants." With little clarity as to possible harm to the class as a whole, the definition of "New Residents," or the size of the class, Plaintiffs have failed to give the court any idea as the true scope of the relief requested.

For this reason alone, and in the exercise of its discretion, the court DENIES Plaintiffs' Motion for Preliminary Injunction.

## 2. *The Substance of Plaintiffs' Motion for Preliminary Injunction*

Even if the court did not deny the Motion for Preliminary Injunction based on a lack of class certification, the court nonetheless finds that Plaintiffs have not carried their burden on the *Winter* factors.

As an initial matter, Plaintiffs are not seeking a prohibitory injunction maintaining the status quo, but rather a mandatory injunction that "goes well beyond simply maintaining the status quo pendente lite [and] is particularly disfavored." *Stanley*, 13 F.3d at 1320 (citations omitted). Specifically, the court cannot return the parties to their pre-PRWORA status because as described above, Medicaid is a joint federal-state program and the PRWORA excluded New Residents from federal funding. Further, unlike the State did for COFA Residents, at no time after the PRWORA did the State provide through State funds only the same medical benefits to New Residents as provided to citizens. Thus, Plaintiffs' Motion for Preliminary Injunction is seeking something that New Residents never

received before -- access to the same medical benefits that are provided to citizens through Medicaid, but funded through State funds only.[8]  As a result, Plaintiffs must establish that "the facts and law clearly favor [Plaintiffs].'"  *Stanley*, 13 F.3d at 1320.   With this heightened standard, the court considers the *Winter* factors.

### a.      Likelihood of success on the merits

New Resident Plaintiffs assert that they have a likelihood of prevailing on their Equal Protection claim because strict scrutiny applies to the State's provision of medical benefits based on alienage, and the State has not forwarded a compelling state interest.

The court agrees that Plaintiffs have established some likelihood of success on the merits -- as explained above, the court finds that strict scrutiny applies to the State's implementation of BHH for COFA residents and New Residents, where citizens and qualified residents receive more comprehensive benefits under the Old Programs.  Further, under a strict scrutiny review, *i.e.*, requiring Defendants to show that their classification "advance[s] a compelling state interest by the least restrictive means available," *Bernal v. Fainter*, 467 U.S.

---

[8]  Although Plaintiffs argued in their briefing that they are seeking only a prohibitory injunction maintaining the status quo because the last uncontested status is the equal provision of health benefits as between New Residents and citizens prior to the PRWORA in 1996, at the June 27, 2011 hearing, Plaintiffs conceded that they are indeed seeking a mandatory injunction.

216, 219 (1984), Defendants have failed to identify *any* viable State interest that is advanced by their decision to exclude New Residents from the Old Programs. And as the December 13 COFA Order explained, budget concerns are an insufficient reason to classify based on alienage -- "when applying strict scrutiny, the 'justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens.'" *Korab*, 2010 WL 5158883, at *4 (quoting *Graham*, 403 U.S. at 376 (quotation and citation signals omitted)).

With that said, however, Plaintiffs have not established that the law *clearly* favors them. *See Stanley*, 13 F.3d at 1320. Determining the appropriate standard of review for Plaintiffs' Equal Protection claim is a legal question that will be reviewed de novo (and is already on appeal as to COFA Residents), and as explained above, courts have split on whether rational basis or strict scrutiny review applies. Although the court finds that strict scrutiny applies to the State's decision to implement BHH for COFA Residents and New Residents, the Ninth Circuit may disagree with the court's reasoning and join those courts applying rational basis review. For example, the Ninth Circuit might construe the classification as one based on Medicaid eligibility as opposed to alienage, and/or find that a court cannot compare the fully State-funded BHH to the federal-state programs provided through Medicaid. The Ninth Circuit could also hold that the

uniformity requirement is more limited than as the court interprets based on

*Sudomir v. McMahon*, 767 F.2d 1456, 1464-66 (9th Cir. 1985).  In other words, it

is an open question whether the Ninth Circuit will hold that strict scrutiny applies

to Plaintiffs' claims.  The law is, quite clearly, murky.

Thus, the court finds that although Plaintiffs have established *some*

likelihood of success on the merits, they have not established that the law *clearly*

favors their position.

> b.      *Irreparable harm*

Plaintiffs have established that the individually-named Plaintiffs will

experience irreparable harm without an injunction.  Each of the individual New

Resident Plaintiffs suffers from serious medical conditions and they will likely not

receive treatment if they do not receive medical benefits from the State.  Even

Defendants do not dispute that the individually-named Plaintiffs will suffer

irreparable harm without an injunction.  *See generally* Doc. No. 66, Defs.' PI

Opp'n (failing to address irreparable harm inquiry).

What Plaintiffs have not established, however, is that New Residents

*as a class* will suffer irreparable injury.  Although Plaintiffs presented evidence

regarding hardship to the individually-named Plaintiffs, they have not addressed

whether that harm is common and/or typical of the class as a whole and Plaintiffs

have not yet sought class certification. This lack of evidence as to New Residents as a class is apparent in comparing the evidence presented as to their previous Motion for Preliminary Injunction as to COFA Residents. For their previous Motion, Plaintiffs presented evidence establishing that COFA Residents could not receive certain medical treatments in their COFA countries and that they as a population suffer from a higher than average prevalence of several serious medical conditions. *See Korab COFA II*, 2010 WL 5158883, at *2. Plaintiffs further presented evidence from doctors establishing that they cannot provide adequate care to COFA Residents through BHH. *Id.* Plaintiffs have presented no such evidence in support of this Motion as to New Residents.

Thus, although Plaintiffs have established irreparable harm as to the individually-named Plaintiffs, they have not established irreparable harm as to the class.

  *c.*    *Balance of the equities*

Plaintiffs have not carried their burden on the balance of the equities. Although Plaintiffs have established that the individual New Resident Plaintiffs may be irreparably harmed without an injunction, Plaintiffs have not established the harm to the class as a whole. Further, Plaintiffs have not addressed in any meaningful manner the harm to Defendants if a mandatory injunction is granted.

Given that the size of the class is unknown and the State has not previously provided New Residents access to the Old Programs, Plaintiffs have provided the court no means for determining how the State might be affected by a mandatory injunction.

Thus, this factor does not weigh in favor of Plaintiffs.

### d. Public interest

Plaintiffs, in conclusory fashion, argue that this factor weighs in their favor because it is not in the public interest to force uninsured patients to seek treatment only when their conditions reach an emergency level. Doc. No. 63-1, Pls.' PI Mot. at 18. The same could be said, however, as to any uninsured individual and there are countervailing considerations that an injunction may impinge on the State's policy and budget determinations. The court therefore finds this factor neutral.

### e. Weighing the factors

In sum, although Plaintiffs have established that the individually-named New Resident Plaintiffs may be harmed, Plaintiffs have not established a clear likelihood of success on the merits, irreparable harm to the class, or that the balance of the equities and/or public interest weigh in their favor. Based upon these factors and given the considerations that Plaintiffs are seeking a mandatory

injunction and have failed to identify the class, the court finds that Plaintiffs have not established that they are entitled to preliminary relief.[9]  The court therefore DENIES Plaintiffs' Motion for Preliminary Injunction.

## V.  CONCLUSION

Based on the above, the court DENIES Defendants' Motion for Summary Judgment as to Plaintiffs' claims directed to New Residents, and DENIES Plaintiffs' Motion for Preliminary Injunction.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 28, 2011.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Korab et al. v. McManaman et al.*, Civ. No. 10-00483 JMS/KSC, Order (1) Denying Defendants' Motion for Partial Summary Judgment Regarding New Residents; and (2) Denying Plaintiffs' Motion for Preliminary Injunction

---

[9]  The court recognizes that the December 13 COFA Order noted that even if Plaintiffs were seeking a mandatory injunction as to COFA Residents, it was "warranted given the serious damage that COFA Residents will face without access to the State Medicaid program."  *Korab COFA II*, 2010 WL 5158883, at *4 n.5.  There are differences between the two Motions warranting the different outcomes between New Residents and COFA Residents.  First, the parties stipulated as to the class of COFA Residents, Doc. No. 37, but Plaintiffs have not yet sought class certification as to New Residents.  Second, the State had provided COFA Residents access to the Old Programs before implementing BHH, indicating that an injunction requiring the State to continue to provide COFA Residents these benefits was feasible.  In comparison, the court cannot speculate as to the size of the class of "New Residents" or the impact of a mandatory injunction because Plaintiffs have not adequately defined the class or presented any evidence as to the feasibility of requiring the State to provide New Residents access to the Old Programs.  Finally, Plaintiffs presented evidence indicating the likelihood of irreparable harm to COFA Residents as a class, but have not presented any similar evidence as to New Residents.